Good afternoon, Your Honours. Sassou Nalbandyan, appearing on behalf of Petitioner Haig Antonyan. The first issue, Your Honour, the government in its April 28, 08, 28J letter stated that Maharashtra essentially agreed with the judge's decision, the ambank ruling in Maharashtra. We would argue that lengthy and undisturbed residence only applies if there is an indication, whether direct or circumstantial, evidence of an offer of permanent residence. And there is clearly no official sanction, in this case in Russia, of any indefinite residence by virtue of him being in the country for four years. There's no propiska, which is temporary residence. That was not even offered. According to Petitioner's testimony, there's no employment authorization given to him. This Court has held in Avitova-Eliseva that Armenians, there is a pattern and practice of persecution of Armenians in Russia. Now, before you get to that, we've got, or at least in my mind, I'd like to get past or at least get to and then think about the adverse credibility finding. How do you deal with that? Because if that adverse credibility stands, the finding stands, we're done. I certainly do. I understand the Court's concern. Your Honour, I would argue that the adverse credibility finding in this case is fatally flawed for a number of reasons. Actually, I'll rapidly go through each one. The I.J. stated that it appears that the individual was repeating word for word the declaration. That is pure speculation and conjecture on the I.J.'s part. If he is repeating word for word the declaration, perhaps it's because it is true. Okay. And on that point, just to clarify, I understood your client was speaking in Armenian and being translated. Is that correct? That is correct, Your Honour. And the declaration was written in English. That is correct. So I don't understand how the I.J. could have come to that conclusion. He had nothing to compare it with. That is a good point, Your Honour. I would agree with that. With regard to whether or not he was a fake Christian and then he claimed to be targeted for being devoted to God, it was not that they accused him of being a fake Christian. The government accused him of being a fake. Basically, the sect was viewed as a fake sect of Christianity in Armenia. And with regard to the reason he was persecuted is because of his actual devotion to that quote-unquote fake sect, what was viewed as a fake sect. How he walked off the base, the government indicates that basically how can he or the judge indicates that how can he walk off the base, just simply walk off the base. This is, again, pure speculation. The applicant testified on page 74 of the administrative record that some parts of the base did not have security or as strong security. How he went to school and opened a business while being in hiding, the applicant stated clearly on page 83 and 84 of the administrative record that the business was not registered with authorities and that he was simply given the supplies. Basically, with regard to details that were not in the written declaration, this Court has held in Singh v. INS in 2002 that an incomplete application without all the details is not a basis for adverse credibility finding. He returned to the home country. That is correct. But after he returned, he was persecuted again in 2000 and 2001. So that does not necessarily undercut the fear of returning to the country. And as well as Boer, Sedano v. Gonzalez in 2005, this Court held that if you return to the country simply to gather enough income to flee the country, which in this case he did state that he ran out of money in Russia, which is why he went to Armenia, and stayed in hiding to ultimately be able to leave the country. The passport given to him by the government is not a sufficient basis for adverse credibility, just simply being able to get a passport pursuant to Mamouzian. But I.J. kept making conclusory statements that it's a fantastic story, none of this is unbelievable. The only real inconsistency, Your Honor, and we would argue that it's minor, pursuant to Bandari, is the hospital record. Whether it's February 20th or the first week of February, the individual clearly misrecalled when exactly in February it was that the incident occurred. The hospital record would clearly not state, or at least, again, this is pure speculation on I.J.'s part, and I apologize, I am speculating a little as well, but perhaps it did not state that he was discharged, or it stated that he was discharged and not that he escaped from the hospital or that he was beaten for such and such reasons because they ---- The record, the hospital says he came in after a fall, and you have an explanation for it. That is correct, Your Honor, because I do not have a concrete reason why they put that, but it could be perhaps because essentially if the hospital stated that the individual was hospitalized as a result of beating at the hands of the government in Armenia, the government is intertwined, they would be at risk themselves of being subjected to harm on behalf of the government or as a result of stating in the hospital record that this individual was beaten or was beaten at the hands of the police. And you submitted the hospital record, right? That's correct. And actually ---- So you didn't think it was the destroyer's case to submit it? I was not the attorney of record. Oh, you weren't. No. I'm actually not even ---- It's only because lawyer didn't think that. That is correct, Your Honor. And, Your Honor, in this case, the hospital record was in the government's possession for over two years. The government had a chance to authenticate it. The individual did not have the original, so he could not authenticate it. If there was any question as to the veracity, the government should have raised it at the hearing. I don't think it's a question of veracity. It's just that if you go by the record, it's a different cause for his being in the hospital than the one he testified to. That is correct, Your Honor. But I would argue even if we concede that point, the rest of the record as a whole, given that there are no other major inconsistencies, that alone. Okay. I think Judge Gould had a question. Yes. Well, my questions are, you know, how does he get away from police by going out on a balcony? And how does he get off the military base just by walking off? And if the hospital record says that he's there for a fall, you know, how can we assume it's for some other reason? I understand your concerns, Your Honor. As I addressed earlier and basically with regard to how he walked off the base, we can only speculate as to what the conditions are in Armenia as to security on a military base. We know how it is in the United States. We do not know how it is over there. And the applicant stated that some parts of the base did not have any security, page 74, lines 11 and 12. How he escaped, he escaped because his sister intervened, and his sister was raped as a result of her intervention. And thirdly, Your Honor, as I stated, the hospital, the rest of the record basically, there is no indication as to the document being false. The hospital perhaps stated that it was a fall because they were afraid of stating that this individual was persecuted at the hands of the Armenian government. Let me ask you this. Is the sister who was at the hearing but ended up not testifying the same sister who, according to his testimony, was raped? Yes, Your Honor. And was she in this country at the time of his hearing with a grant of asylum? I believe so. Yes, she was. And what are we to make of the fact that at the beginning of the hearing, his lawyer represents that she will testify, but at the end of the hearing, his lawyer says, you know, she's changed her mind and she's not going to testify? Your Honor, generally, again, I understand the Court's concern. Generally, the law is that if there is any other indications of a lack of credibility, the Court can draw an adverse inference and take the record into consideration with that in mind. However, in this case, we would argue that, basically, there are no significant inconsistencies, so he did not even need to present corroborating evidence. So we would ask the Court not to make that negative inference because there are no indications. Here's my problem with it. I'm not quite sure as a matter of law what I'm supposed to do with it. But her presence at the beginning with the representation by his lawyer that she will testify, and then, as I just said, she doesn't want to testify and goes away at the  There's one possible explanation, that as she sits there and hears the story, she becomes worried that she doesn't want to go down on the stand and support a story that she doesn't think is true. Your Honor, at that point … I'm not sure what I'm supposed to do with that possibility. Exactly. Because at that point, we would be doing, even if we are correct and you are correct and such speculate, we would be doing what we want the IJs not to do, which is speculating as to why she did not appear. And finally … We just don't know. We know that she was there, supposed to testify or represented that she would. We know at the end she doesn't, and that's what we know. That's correct. I mean, this is another speculation, but you could speculate that a woman who has been raped, when it comes to making a public account of it, might have sudden qualms and just not want to go ahead with it. Yeah, sure. That is a good point, Your Honor, and that could be the case, again, in speculation, but it could be the case because the lawyer did say that she got anxious and nervous, so that could be the case. And finally, really briefly, I realize I'm running over my time, but with regard to the Katz claim, even if, although we would argue that firm resettlement is clear in this case, that there is no firm resettlement, even if it comes down to the Katz claim, Your Honor, in this case, the attorney appealed the entire application, asylum application, which there is a box to check the Katz claim, although he didn't mention it in his briefs at the BIA in the Ninth Circuit, pursuant to Muradian v. Gonzalez, this Court last year held that there is Katz relief for an Armenian soldier because deserters are likely to be tortured. Okay. Well, you've used up all your time. Let's hear from the government, and then we'll give you a minute to respond. Thank you, Your Honor. Good afternoon. Peter Matson for the Respondent. The credibility determination is dispositive, and I would fully agree with the Court's initial comments earlier today. The immigration judge in this case ---- But my comment was only that it's dispositive, not as to how I thought it was supposed to come out. I believe that the credibility finding must be addressed first because the evidence used during the hearings was used for the firm resettlement finding, and if there's a credibility finding, we need not travel down the firm resettlement road. The judge listed multiple inconsistencies and implausible testimony. By my counting, 15 separate entries in his order where he said that the Respondent was not credible. I would like to highlight for the Court five areas that I can derive, three of which were also included in our brief. The demeanor finding by the immigration judge is based on his observation and on his evaluation of the testimony in front of him. Well, if you want to respond to the question I asked the other counsel on, if he's testifying in Armenian, how does the IJ get the sense he's repeating something written in English? The method in which he responded to the judge's question. I'm sorry. I'm not hearing you. The method in which the Mr. Antonia responded to the judge, as I see it, gave the judge some indication. The method in which he responded. The way he spoke. In Armenian. The judge could read that. He could tell from the tone of his voice. He could interpret. Really? I believe that. He could interpret a language that I think is fairly different from English. The nature of his voice and the way he reacted and the way he sat. Oh, really? Demeanor finding is a difficult thing to review, and hence the increased deference to it. Well, you know, it's a favored gamut of IJs to play the deference card on demeanor. But doing it in such a standard way, we have to look at it with a little bit of skepticism. So don't dwell too much on that. Yes, Your Honor, very well. We're returning up to other areas of direct and clear contradictions in the testimony and inconsistencies. He returns to Armenia in 2000 claiming that things might have been better, and at the The judge didn't believe that that made any sense whatsoever. Why return if your father is still being arrested? Secondly, he was able to cross the border from Armenia to Georgia and return from Russia to Armenia and then to leave Armenia. So at least three, and perhaps adding two more if he returned to Yerevan from Russia to get a new passport, as many as five times a deserter from the Armenian army was able to cross the border. It didn't make any sense and was implausible. Third, the knowingly false hospital form. Either it's accurate, and it says he fell, and that was the nature of his injury. Well, his counsel knew that record and put him on the stand. He could not have believed that was a contradiction. He must have thought there was an explanation for why the hospital record diverged from his client. You don't suppose they knowingly put on contradictory testimony, do you? I can't possibly understand why a form like that would have been submitted by a counsel. But he did it. So, I mean, it's his own evidence. And you say, well, it trips him up. But it would seem to me that if they put it on, they thought they had an explanation. The judge didn't admit it for that – because of that, and because by his testimony, which he changed in the middle of his testimony from, I escaped from the hospital with the discharge certificate, which, upon being reminded of it in cross-examination, changed his story to say, well, my dad went back 10 days later to purchase it, which the judge considered inherently unreliable. So the hospital form was not – But what was inherently unreliable about that? To have someone buy a form, a discharge form, to – You don't – some of these IJs don't believe that bribery exists in foreign countries. They're all officials of the utmost integrity. The – What's inherently incredible about bribing a hospital to get a discharge? Particularly where the Petitioner, in this case, said that he left with it first and then changed his story to say – Well, let me say that. But it's not inherently incredible. It may or may not be true, but it's not – there's nothing inherently incredible about it. Moving on, then, the testimony regarding the first major incident, as described by the alien in this case. His sister is present. He's in the house. The military police show up to conscript him for the Armenian Army, and he either escapes off the balcony or he was able to get rid of them. And then, when the doubts were raised by the judge and his determination, the response was that his sister would not testify for him. Sidhu and Majir Pais clearly state that it's sufficient for a credibility finding to be based on a failure of someone to testify. In Sidhu, the problem was that the person was in a suburban town. In this case, that witness was in the courthouse and could have removed all doubt from this case and yet did not testify. Now, I may be tangling up the facts of this case a little bit. Did the rape of the sister, according to this testimony, take place as part of the same episode where he escaped out the balcony? Yes, Your Honor. His testimony was that it was in March of 1994. According to the record, Anna's asylum application was premised on an attack that occurred in April of 1994. The date, I don't know, is a month. But nevertheless, she is available to remove all doubt about that issue. Would you comment on the IJ's view of his religious sincerity? He doesn't believe they said he was a fake Christian, but they said he was devout towards God. Are those really inconsistent statements? Based upon the objective evidence in this record, Pentecostalists are not those who are persecuted in Armenia as Jehovah's Witnesses and Well, we don't know that. We know the State Department said that JWs are persecuted. There's no statement about Pentecostal. They're a tiny group. We know nothing about them in terms of the State Department report. The majority of his testimony in the gravamen of his complaint in this case is that he didn't want to serve in the military. I understand that. But I'm looking at the IJ and his rather hostile approach to anything that was said. He seems to think you can't be devout to God and be called a fake Christian. He doesn't know anything about the history of Armenia, that these are very ancient Christians with their own ancient church. They're going to look at Pentecostalists as fake Christians. That's the way they think. There's no inconsistency there. But he doesn't know enough to see that. The conclusion based on the testimony offered to the judge was What's that? The conclusion that the judge offered on the Pentecostal religion issue clearly was clouded by the testimony that he was attacked or beaten or whatever because he was a deserter and because he didn't follow orders on a base. He didn't want to wash clothes and clean up after officers, was essentially the reason why he deserted and then fled to Russia if his testimony can be believed. One of the difficulties in this case is we must be selective at some times of which testimony we can believe and which we do not. If he was beaten for not following an order in Armenia or he didn't like the orders he was given,  and certainly, frankly, welcomes him to the great class of enlisted people in every military throughout history. The majority of his claim is based on his military service and his reluctance to be a conscript in a country that provides for mandatory military service. That's not the sufficient ground. Finally, I'd like to conclude, I think, by agreeing or at least offering that the credibility determination is clearly supported by substantial evidence in this record and a reasonable fact finder would not be compelled to conclude otherwise. If the court, however, determines that the credibility determination was in error, then there are a number of additional difficult issues present. The first of which is, of course, as I indicated in my supplemental authority, Maharaj was decided well after the judge applied the standard as he understood it from Cho and Andrejian, and it may well be that should the testimony prove credible, then a remand would be necessary not merely to address the additional concerns, but Maharaj seems to stand for the proposition that evidence of the third country's law must be presented. That was, as I understand, the remand by Judge Reimer. In this case, there's no Russian law in this record. However, I believe that based on this record before you, the adverse credibility finding certainly withstands scrutiny, and on that ground the Respondent requests that the court deny the petition for review. Okay. Thank you. Would you like a minute for response? Briefly, Your Honor. Thank you. With regard to the last point, Your Honor, very briefly, whether there is the Russian law in the case or not in this case does not warrant a remand because essentially the individual was specifically asked, did you receive a propiska, which is temporary residence. He was not even given that. With regard to the conscientious objection that the government just raised in its oral argument, there could be mixed motives and also uneven treatment of detainees. In Armenia, the country records in the record indicate that conscripts who are essentially Pentecostal or Jehovah's Witness, actually, they are treated unevenly. Let me ask you this, and I confess that I'm inviting trouble on Ventura if I allow it to influence me on my decision. Nonetheless, I want to ask it. Assuming everything he says is true, tell me how this rises to the level of persecution sufficient to support asylum. Your Honor, basically with regard to him being detained, beaten to the point of unconsciousness, his sister being raped, family persecution could also be. There's no argument that he's going to be raped or that he was. No, but he was beaten to the point of unconsciousness by government authorities. Now, for doing what? For participating. Well, in 2000, they were having a religious gathering, a Pentecostal gathering, and he was detained, beaten to the point of unconsciousness. That alone is sufficient. Now, does that lead to the hospitalization or something? Yes, Your Honor. The hospitalization that, according to some other evidence, might have been due to a fall. That is correct. That is correct, Your Honor. And with regard to him, final point, returning to Armenia in 2000, there is no indication in the record as to when his father's, yes, he was arrested four or five times. There is no indication during that, the years that he was in Russia, whether it was the first year he was in Russia, exactly when the father was arrested. It could have been years later that he returned to Armenia, and he stayed in hiding when he returned. So thank you very much, Your Honor. Thank both sides for their arguments in this case. Antonin v. Mukasey is now submitted for decision. The next case on the argument calendar is Lee v. Imogene III.
judges: Noonan, W. Fletcher, Gould